May it please the court, my name is Michael Gillette. I'm here representing the hospitals in this case which involves the commitment of persons suffering from mental illness to the civil custody and control of the state. My clients are responsible in most instances for receiving individuals who are in an acute phase of a mental problem and stabilizing them so that they can receive further treatment elsewhere. And what we have is a situation in which although the Oregon law which is quoted in our brief directs that persons who are to be who are stabilized be sent to the Oregon Health Authority and the Oregon Health Authority placed them in a facility which is designed to further their rehabilitation and permit them to return to society, the Oregon Health Authority won't do it. There are instead what's happened is that the individuals who have been stabilized and then who have received a court hearing, and by the way the court hearing is held while they're still in the hospital, it's one of the outcomes of COVID which you can regard as good or bad depending on how you feel about that, but the hospital which finds itself in a position in which someone they have stabilized is ready to be taken in by OHA in place somewhere where they can receive the kind of long-term care that is required in order to really make them safe to return, safe to themselves, safe to the community, to return to the community. May I ask a clarifying question because I think the the complaint is quite extensive in laying all of this out. Is there a financial difference if someone comes in, they're in the acute care, but they're now evaluated ready for release from acute care, but they can't be released because there's nowhere for them to go. Does the reimbursement to the hospital change or does it remain an acute care reimbursement or how does that work? Judge, I've asked that question of my clients and and their answers are, depend on their present experience, but apparently people who come in needing acute care normally receive whatever coverage for acute care they're entitled to by by Medicare or Medicaid or by private insurance or whatever, but the recompense for putting them out to another facility is depends upon whether that particular kind of insurance also provides that kind of coverage, so there is no flat answer. The financial consequence to my clients is just that they have someone there that they are not qualified to care for. Let me rephrase that. They're not qualified to provide the kind of care those persons are supposed to be getting. There's no guarantee that there's going to be any particular payment to them after the acute phase is finished. Let me answer Judge McEwen's question. You just said no guarantee they'll be getting any payment? My understanding is that for acute care they get paid. If there's any source of payment, they're going to get paid. And who are they being paid by? It depends upon whether they have private insurance or whether they're in a cooperative of some kind or whether they're subject to Medicare and Medicaid, but Medicaid at least isn't going to pay for long-term rehabilitative care, and I think that's true of a number of private insurance arrangements as well. So the answer is there is no answer. It depends on the individual entirely. Thank you. And you're asking simply a declaration or injunctive relief, is that right? That's correct. It's a situation in which this problem arose over a long period of time, and in fact you can trace it all the way back to the 80s when there was a complete shift in national policy concerning persons who were suffering from mental illness. And it can't be cured tomorrow, but it's not going to be cured at all until a state agency which is responsible for the cure is told to do your job. Instead, by leaving the patients with us when we're not qualified to provide the kind of care that they need, what's happening is our resources end up being dedicated in part to looking after those people as best we can, and we become just that much less available to those who need our care and for whom we could provide appropriate care. So that's what the case comes down to. We're harmed because we can't do the work our facilities and our personnel are supposed to be capable of doing for some people, because we've got other people we're required to hold on to and maintain, which I guess would be the best word for it. But you also intimated or maybe declared more clearly that there are no facilities, there are not sufficient facilities for long-term, longer-term care patients to go to, is that right? Judge McEwen, I was responding in part to what you, to your own remark. The answer is yes. We've not just animated that, that's the case. There are, and I'm going to get the numbers all wrong, but there are nine hundred or a thousand available long-term care beds, and in fact the need is much greater than that and is going to continue to be much greater than that. It is going to require an investment of time and money and thought into creating a system which will receive, but in the meantime, as hospitals, we're required to keep these people because, one, they're subject to a judicial order that says they're to be taken care of, and secondly, because we're a hospital. We're not supposed to turn people who are still ill, whether mentally or physically, back onto the street, and so we don't do that. Now there's been an attempt by OHA to the district court judge to say, well, you could just quit, you know, stop providing the care you're providing. That didn't strike me as being a particularly insightful way to approach the problem, since hospitals are part of a sort of three-legged stool of security for individuals everywhere in our state, and I dare say everywhere else. The police, the fire, and the hospitals are the places for emergencies, and we provide emergency care, and we're good at it, but we are not built for, and we are not staffed for, dealing with people who require the long-term care and the special attention, individualized attention, that's necessary in order to help these people return to society and be useful. Judge Fletcher, you looked like you were going to... Well, I want to address, or have you addressed, the Article 3 question, the Article 3 standing question. This is now hospital standing on its own behalf, not yet getting to third-party standing. Understood. The judge appeared to feel that there was no satisfactory traceability between any harm that the hospital was suffering and anything that OHA had done. I suppose the more accurate way to put it would have been to say what OHA hadn't done. Well, Jeffrey does hesitate. You guys are basically volunteers. You signed up for this program, and now you're complaining. We didn't sign up for this program. That's just false. We did not do that. You signed up for a program that turns out not to be the actual reality. Yeah, we signed a deal to do X, and now we're told, well, surprise, you also are going to have to do Y because we're telling you to. In the normal administrative law context, the OHA doesn't have the authority to do something that we didn't agree to do for them. It seems to me that you're right with respect to whether or not, even if you did volunteer, we've got the case law out there that says certain volunteers, and they nonetheless have Article 3 standing. The question not really addressed, and maybe not yet teed up, you've got a takings claim, and you've got a due process claim, and you may or may not succeed, but the door open. We're not being allowed to come forth with our evidence and work out a solution for the problem. Yeah, we haven't had that shot yet. This is a 12b6 matter. So let's assume the hospital, like Judge Fletcher, I'm going to get later to the patients and the third party standing, but let's assume that the district court complied with your request, and that is to issue this, declare that OHA's policy violates various Oregon statutes and possibly various constitutional protections, and then where would you be? They would say, well, there's no beds. I mean, we can't manufacture a bed out of thin air. So where would you be? I'm trying to understand the practical implication. Sure. The day afterward, we'd be in the same position we're in now. That is to say, we'd have people with us who shouldn't be with us and who needed another kind of care. That can't be fixed in a day, but the judge, if the judge is willing to enter an order stating that we're entitled to relief, then we would apply to the court for an order to OHA at least convening a group. You were going to hear another case today that involved that same process being used in Oregon with respect to those who had been committed in the criminally convicted or accused side of things. It would be necessary for people to get together and propose a solution. There is, in fact, a movement underway in the Oregon legislature to take another look at this problem, but then the other look is going to then require weeks and months and years of well-intended effort in order to solve the problem. In the interim, we will continue to care for these people because we're a hospital and because that's what we're supposed to do. It's not a satisfactory arrangement from our point of view, and it misapplies our assets to a degree, but to turn them out or to say, all right, you folks, we've stabilized you now, now you can go out on the street again, that's not medicine. That's not performing that service. This is kind of a follow-on. Assume for a moment that we were to find standing and we were to say that this can go forward. This is a version or carry on of Judge McEwen's question, what then? Would one of the possible remedies be that the state has to compensate you for keeping them in this long-term way, the compensation that you apparently in some cases are not receiving? Your Honor, I don't think that would work, at least I can't imagine it working the way things stand now, because we can't do this work. This is not, if they compensate us for something... Well, I understand you can't do this work, but nonetheless you are keeping them in a way that you say really is not appropriate, but you're nonetheless keeping them, and it's a considerable expense to you apparently in some of these cases where you're not getting reimbursement. Well, if your takings claim succeeds, well, what takings is the government imposed an obligation upon you for which it owes money, but it's not paying. This begins to slide over toward the reason we also wish to appear in a representative capacity. We don't want money. We want to help these people, and the money ain't the answer. If that seems a casual answer, I We're not in that line of work. We're not for profit. We'd prefer to be not for profit for the right people. Unless the court has other questions, and Eddie, paying attention to the judge's reminder with respect to no penalty will be imposed. No, no, I'd like you to address the third party standing, because we're quite accustomed to the third party standing where the doctor is advocating for his or her patients, and the doctor wants to provide care for the patients. This is an odd one. You're advocating for the patients because you don't want to provide care for them, which gives me pause. Well, I guess I'd, I want to phrase it differently because it works out better for me. I want to say we're advocating for our patients getting the appropriate level of care, which as it happens at the moment, we cannot provide. No, no, that's, that's another way and an accurate way of saying it. I get that. Okay, and, and, and that's the way I would want to go at it. Let me suggest, and we've, we've cited cases to you and you will find them useful or not as, as appears appropriate, but there's a case from Pennsylvania involving a group of psychiatrists who brought what amounted to a claim that's reasonably similar to the one we're bringing, trying to influence the care that's being given psychiatric patients. The idea here is that if the only care we can provide is to advocate for them getting care somewhere else, then that's the care we're going to advocate for. This is still part of our mission. Let me ask you this. Why couldn't someone else, other than the hospital, represent these people? I understand these people are gonna need extra help in terms of finding lawyers and representation, but there are many other groups who would, who can step up and represent them. Why is it the hospital, which I appreciate you've done a very good job of articulating why there isn't a conflict, but I could see other groups that would have an even easier time stating why there isn't a conflict. So why, why can't one of those groups represent in these third-party claims? To the extent other groups exist, they haven't stepped up. They just haven't done it. There is a group that is representing, again, the criminally accused in Oregon, Disability Rights Oregon, which has done a splendid job of representing that group, but it has not seriously dipped its toe in this water. It's left this to other people. There's also an organization called, I think it's NAMI, which is an organization that's made up in part of people who actually have been patients in this kind of system and who are advocating for others who are suffering from mental illness. And they, they are an advocacy group. They're not put together to provide the that we're providing. They would prefer to support rather than sponsor. So you have an amicus brief from them that says what, what they said. We agree with that. So the answer, Your Honor, is that there ain't many folks and none of them have stepped up. And this has been going on a long time. This, we didn't just discover this last Tuesday. And so we've been driven to it. You have two groups of people here. You have the criminally committed that you say potentially the Disability Rights Organization could represent. But then you have those who come in on just a regular civil commitment, right? And has anyone ever represented them as a group? As a group, no. Are you aware of any individual suits? Yes. Okay. Yes, there was one that was prosecuted by one of the hospitals, one of my clients, and I'm too awful long ago, two or three years ago. And they pushed the lack of facility and so on against OHA and won. But the difficulty was that was one person. And we're talking on behalf of one patient? That was on behalf of one patient only, yeah. But again, that was a hospital pushing it. Just, this isn't sexy with respect. It just is simply something that folks are not inclined to dive in on. And when you look at the provisions of Oregon law, and I think this is true most places, with respect to representation, a person who is faced with civil commitment is entitled to counsel. And there is a very carefully set up process by which the person's mental state is judged by an appropriate judicial officer. But the minute they are committed to the care and custody of the there is no further legal help for them at all. No provision in Oregon law whatsoever. It's either OHA does its job or they are lost. And so, and I guess this is addressing your question, Judge Fletcher, this is an honor we just as soon have skipped. But somebody with a conscience needs to do this. And we are in the business of trying to help those who can't help themselves. So it's our job. And you can imagine the time it might take for somebody else to tool up, even if we could point to somebody else, that which would include Disability Rights Oregon. They have a long-standing process they've gone through before this same judge with respect to the care that's being given to persons who are committed in the criminal justice system. And it's not the same kind of problem. So that I'm not sure that they could tool up with with it for some period of time and they'd have to expand what they're doing because that's right now that's all they're doing and they're using their resources to do that. There just isn't anybody. And there might even be some conflict between your client or rather the patients that you have at issue and the criminal. Because as I gather what's happening is that the Oregon Hospital is priority to the other two groups and your people are at the bottom. I didn't want to say it that way because I admire what DRO does. But the truth is that whatever pot of cash eventually will be used here, there's one group that already is seriously invested in getting that pot of cash for their particular set of clients and they are not ours. If the court would allow me I would like to I'll compromise. They'll give a four. That's that's more than more than fair and I'll get out of your way. Thanks very much. Good morning and may it please the court. Dustin Buehler appearing on behalf of defendants at bellies in this matter. I think the key thing that opposing counsel just said, which really is essential to the three issues before this court, is that this is a long-standing challenging problem that Oregon faces and it doesn't face it alone. Many other states are facing similar challenges when it comes to providing adequate care for civil commit committed individuals. The challenge that Oregon is facing, it's a challenge because Oregon is not stepping up to the plate. It's a challenge because Oregon is not fulfilling its responsibility and then we're trying to figure out how do we deal with that. So that is what the complaint alleges certainly judge and you know what is key though about that is that when you look at the article 3 standing question and I'm happy to take each of the three issues before the court in order unless you want to steer me in a different direction but if you look at article 3 standing as you've alluded to your honor the question really here is well was this voluntary right and and that is I mean this court will ultimately determine whether there's jurisdiction or not but the district court concluded that notwithstanding those real problems alleged in the complaint here the hospital plaintiffs have known about those challenges for decades as opposing counsel just told you and they have not only sought certification to provide acute care services but they have every two years re-upped that certification and at some level that is going to break the chain of causation as the case law describes such that you don't have article 3 standing to seek an injury that is not surprising and that you have known has existed for as as plaintiffs say for decades. It seems like a kind of a nugatory argument in the sense that let's say they don't seek certification who's going to care for the acute care people if they get dropped into their hospital they have to right so it that is an argument that maybe has some legal legs way back but I just I'm having trouble getting a practical head around it so maybe you can help me. Certainly judge so as described in the briefing there is this let's call it the ER's door right the emergency room care and some of these patients that the hospitals seek to represent in a third party capacity here do come in through those doors and there are federal laws state laws that require the provision of emergency care and although there was confusion I think frankly the lawyers for both parties at the district court hearing were not consistent in their statements at times I think when you're civilly committed you don't just get let loose that that is not a choice right so just let's just make that clear here but I still think if you look at the moment at which they have a claim that they're seeking relief for and that moment to be clear is somebody has been civilly committed and placed in their hospitals and there's a moment at sometime after that where they then need care that plaintiffs would not describe as acute care right so that is the moment at which they have a that they're asserting claims and if you look at that moment for years they have sought to provide acute care services because there is an advantage to the hospitals in doing so a business advantage in doing so the record shows that the complaint shows that too and they've done that with full knowledge that the bidder comes with the suite so to speak under the law you can sign up for acute care but you didn't sign up for long-term care so it would seem to me at that point they have not taken advantage of the system because even if they signed up for acute care it should have ended that's what they signed up for was a fixed term but now they're they like some of these individuals are like committed for a long time so it seems to me that at that point that they haven't advantaged the system in some way or they haven't affirmatively invoked the system they'd like to un-invoke the system because their argument is that your client is violating the Oregon statute so it seems to me that that they would have standing and I just I'm having trouble buying the idea well you signed up for acute care so in for a dime in for a dollar and for a hundred thousand dollars or whatever the case may be. Yes so it is clear and these are in the documents that the district court took judicial notice of showing what what boxes they checked right in the excerpts of record and and it's clear that they sought to provide acute care and I would even add that's absolutely true right and but did they sign up to provide long-term care? So you so if if what we're referring to are the boxes for secure residential treatment facilities under Oregon regulations hospitals they can't check those boxes those are limited to six to six to sixteen patients so they they applied for the care that they could right and then I think the key thing for article three and look it's either good enough or it's not it's what the district court thought is that they signed up for that acute care service level knowing full well that the door out was not a meaningful door out given the strain on the system and so the question really is for article three is that knowledge when you re-up enough. I understand your argument but how do you deal with and along this line there's the Medgar Evers case there's the Havens Realty case there's the more recent Cruz case in all of those circumstances the plaintiff is coming into something that he knows is going to be a problem he does so voluntarily and then he objects to it how do you distinguish those cases? Right and I will acknowledge the tension in the case law right certainly I'm not gonna hide from that I think the way I would distinguish it was articulated by the Tenth Circuit in Fish v. Schwab and Fish v. Kobach where the court said look there's a difference there's a meaningful difference between cases in which you're challenging an unlawful regime by statute and regulation right so there's let's say like the Cruz case there is an allegedly unlawful federal enactment and really the only way you can challenge that is to disobey it right so that's one category of cases what the Tenth Circuit said is that that's different from something that is more akin to a freely negotiated contractual arrangement. Now I will admit this is not purely a contractual arrangement but the argument that the district court seemed to find convincing is that when you years ago apply for certification to provide care and for years and years and years as alleged in the complaint you are not just providing that care you're providing more than that and you keep re-upping every two years that starts to look like a voluntary business arrangement that in the hearing and I would direct you to pages really the key pages are pages 98 to 101 of the excerpts this is in the second volume it's the portion of the hearing that the district court relied on for better or worse for its article 3 conclusion on standing where counsel said that currently the way it generally works is if you're not a certified hospital you can transfer out patients to a certified hospital that is that is how it works and that they are choosing to certify and to take on the bidder with the suite because there is an advantage to providing acute care and so they agree to take for acute care and then they're stuck with obligations because of their status as a hospital but not because of the contract I would say it's reality right yeah that that is how the system is working and they they know that there are certain federal laws as you're referencing your honor state laws that obligate them to continuing care for emergency room care for example but I think the broader argument is that they I heard opposing counsel say that this was surprising it if you look at the complaint and you look at the documents that are judicially noticed and you read the transcript of the hearing below this was not a surprise and that's either good enough or not good enough for article 3 standing we would say it's it's it you know they don't have article 3 standing for that and you've not yet addressed in this lawsuit the underlying cause of action under the antitrust excuse me undertakings or under due process that we just not are not not at that stage correct well so below there was a 12b1 and 12b6 motion together the parties briefed both the jurisdictional issue but also the correct and and and there is even you can see in the transcript the district court asked some questions about the merits or at least on a 12b6 posture the district court did not get to that it just concluded it didn't have standing and and you know in fairness if you read the transcript the way it reads to me is that part of what was unsettling about that discussion is I don't know going into that hearing if the parties were aware that that that the judge the district court judge really was interested in standing and so that's where you get some of the inconsistencies as to who can quit or not at various stages of offering care and I just want to be clear the court I think the key thing to think about here is not whether you can release somebody who's civilly committed because I don't think you can I think the question is when a hospital goes in to an arrangement and reups time and time again with full knowledge of what that arrangement is is that voluntary that's the question and and and to be clear look we're glad that they care for these patients we pay them we would pay them more but for article 3 I think the question really is is it voluntary you would pay them more under what circumstances you would pay them more tell me more yeah and I don't know the details of this I just know that the attitude you can see it it said in the hearing below I mean that's what counsel for OHA said below is that it's not it's not like we have animus to these hospitals we understand the strain that this puts them under but at some point you know it's kind of the Casablanca shock to find gambling scenario where they knew about this for years and so to seek redress for it seems a little disingenuous you explain in a sentence in the judge's order it confirmed that we're health systems to decide not to seek certification they would no longer be required to keep civilly committed patients for long-term stays yeah so here is how I would explain that and I'm not sure I can't put myself in the district courts no no I'm just trying to understand the fact right here is my understanding of the facts is there was that moment during the hearing where counsel for the hospital said and this is in the middle of page 98 of the excerpts said look the way this generally works is if you're not certified you transfer out the patient you know if the patient's transferred to a certified hospital right when they come into the ER or when they come in the door and then you know on the next page or two counsel says look we choose to be certified because there are advantages business advantages of providing acute care as to what that sentence means in the district courts opinion let's say somebody comes in like for 72-hour hold we're gonna have a hearing right they don't seem to be mentally capable of being released but they're in this they come in usually through the emergency room in those situations so they're in the emergency room they got to put them in a bed they they're in a place where there's no certification where do they go do they just stay at that facility because there's no long-term care so at the initial phases you're talking about judge when they arrive at an uncertified hospital my understanding is that when that is like currently the way that is handled is they are transferred out like they're there you know that Oregon law is clear that you require certification to treat civilly committed patients and so so they are transferred to a facility currently that can provide that service and and that's my understanding is that and how many facilities beyond the facilities operated by this organization are certified to provide that care so I don't know offhand I I know what they allege in the proposed second amended complaint that they have 57% of the acute psychiatric beds statewide that's the only fact that I think we have in the record but I don't know the answer to your specific question I do want to just I don't want to steer the court away from this if we want to talk more about it but I do want to address third parties great let's do that before me I'm trying to judge Owens take you up on your challenge to leave time on the clock and I'm failing and so I will addressing the third-party standing issue I think what is probably the best place for this court to look in the record is in the supplemental excerpts of record there is an amicus brief that was filed below that the district court found quite persuasive from Disability Rights Oregon now this is the organization that is federally designated as the protection and advocacy system for those with this disability in Oregon including those with mental illness and you can just I'm not going to repeat them ad nauseum here but I mean you can see the reasons given by Disability Rights Oregon why it's concerned about the potential for a divergence and incentives here and and while I greatly appreciate the spirit of opposing counsel's comments today about their mission the hospital's mission and while we we are grateful for the provision of service by hospitals if you look at the complaint you can see that tension so looking at the relief in the complaint that's pled in the complaint this is on pages 254 255 of the excerpts of record there is both a request for a declaratory injunctive relief to have OHA discontinue forcing them to provide indefinite care but then there's also a request for relief on behalf of these patients for them to receive the best available treatment in a suitable facility when you overlay and and and I would cite this as passive in the complaint the number of times where they point out as they did today that there just are not enough beds you're left with a divergence in that either a result here or maybe even a negotiated settlement by prioritizing the let's get them out the door you could lead to suboptimal placements and that is just a fundamental tension here in these claims the case law is quite clear that third party standing is not the norm and here hospitals that have a financial incentive to transition patients out are not going to be as DRO noted below the best advocates for the patient's interests and there is that inherent tension here that the district court based its third-party standing ruling on the other thing I'll just point out briefly is paragraph 43 of the complaint this is on page 239 of the excerpts notes that these hospitals are losing tens of millions of dollars each year because of this arrangement they are asking for just compensation and that is a not insignificant amount of funds that if reallocated through just compensation could lead cause suboptimal placements because of the systemic effect that that would have and look I'm not pointing out anything that isn't noted in the DRO briefing below but I just would urge this court to think carefully about that given that the interests of patients are important here so the upshot with no standing is that inadequate care continues apace right no that's that's not true you know both in the mink case there are discussions in the mink case and more generally to try to improve this care there is and look this is not in the record which is why I'm not going there except to answer your question you know OHA now has coordinators that meet regularly with the hospitals to try to improve transfers to listen to concerns around specific patients so it's not I just want to disabuse the notion that it's lawsuit or bust that is not true I understand I can't point to places in the record that show that because we're on a 12b motion but I just don't want this court to be left with the well let me understand again the practicalities it appears that the hospital capacity or the treatment capacity for long term just doesn't exist is that right I mean that's the basic problem so yeah I mean I think that that is it's alleged in the complaint and while you know we could quibble with allegations I think it is no secret that there is inadequate beds in the state of Oregon generally including long-term care and is Oregon required by Oregon statute to provide such beds and Oregon just isn't doing it so I I will admit judge I don't offhand know I just don't know enough about it it's a very elaborate legal you know statutory regime I just don't know offhand here today that puzzles me that you know that you're here so so maybe Oregon's required to provide the beds and maybe not that's your answer no I am sorry about that so what I'm saying by that is certain so here's where I would point for that if I were given the record and the laws I understand it I mean Oregon has an obligation when OHA takes civilly committed persons into custody upon their commitment to make an appropriate placement and to that you know in chapter 426 of the Oregon revised statutes there are obligations on the Oregon Health Authority to make adequate placements to calibrate those it also says that the placement decision is a final decision there is going back to the third party issue there is an ability by civilly committed persons to challenge those placements that is a procedural safeguard in the statutes but I don't want to leave you with an unsatisfactory answer that's what's coming to mind in terms of how that works and the obligation of OHA to place  well and the obligation to place does that include the obligation to provide meaning does Oregon have an obligation to provide suitable facilities yes I understand Aragon law it does have that obligation but you can tell me I'm wrong so I yeah I just don't have that before me so I don't want to get that wrong okay help me move some more with the third party standing in terms of you you predict that if we were allow third-party standing here some some optimal some sub optimal thing is going to happen what is that sub optimal thing and why is it going to happen in your view yes so I think the hospitals their complaint is replete with allegations showing that you know this is a it's a financial disincentive for them to keep patients into long-term care or beyond what they would say the period of acute care is also they say repeatedly that there are other patients they have non civilly committed patients that need the beds and so there's a tension there among their sorry among their categories of patients where they might not have the undivided loyalties to these patients and if the goal is to transfer them out we are in a system where you know there just are not adequate beds meaning where and DRO notes this in its briefing there's no guarantee that they'll go to a place that is as good as their current placement is what I'm trying to say and DRO made that argument in its amicus brief below and is the hospital seeking permission to send them to some some suboptimal place means that what they're requesting in the lawsuit no that's not what their relief is in the lawsuit no but I know so what makes you think that's going to be the result of the lawsuit because I think the practical reality is as DRO noted in its briefing below that there is just a to get them out as soon as you can so I know I understand that but that that exists no matter how we rule I mean that that's been in existence for a very long time and they apparently they're keeping them so how would a order from our court that says Oregon has an obligation to provide suitable placement for these people how would that change the reality how would that then allow them to send them to some some optimal place where they're not now sending them how would that change so I I mean I think I think the point is and you're right there's an obligation to place them suitably and thank you because that that really I think addresses your earlier question that is in the statutes I just think if you have a situation where these hospitals are rendering care because they need to and because the strain on the system you know as they say in their complaint there just are not beds elsewhere to send them to and I think that that means if you're trying to transition them out you know there's an and that's just not the case but as I understand what I understand the purpose of the underlying lawsuit is somehow to force Oregon to start spending money to provide appropriate placement that Oregon has so far been unwilling to spend I mean that that seems to me the thrust of the lawsuit so I mean and they could speak to that but my understanding is that although if you look at the relief I just want to note it's not just that right like there is a financial aspect of this for the hospitals that may converge but may diverge so I just want to acknowledge that but yes I think that that is well and I'm trying to understand the may converge because the may converge depending on how likely there is a divergence I mean that's that's the key to the third party standing analysis right and I'm and I'm having trouble still understanding the nature of the divergence because I think I just heard you say that if we allow them to go forward as third party representatives they're nonetheless going to be subject to the same obligations they have now in terms of not placing them to some some optimal place but you told me they're going to do that and I don't get I don't quite understand yet well so I and this is your honor this is where maybe the the transcript below is informative because there's a there was a colloquy below where for example the district court judge said well what if this you know what if this case went into settlement discussions at some point like isn't there a tension between the hospitals and their interests financial or otherwise and and the interests of these patients in receiving a placement that is suitable regardless of the financial cost right and so I mean and I understand look part of the challenge here is we're trying to think ahead hypothetically to what could happen but I still think like that exchange below is very informative because the path of litigation could lead to a moment and frankly likely would lead to a moment where the hospital's interests would diverge from patients that need the best care available regardless of cost or other considerations regardless of whether patients may need that bed in the hospital at some point and this is really the point that DRO was making below they're just different interests I see I'm way over my time and I apologize for that we put you there thank you you've given me my workout and and unless there's any other questions we would urge you to affirm thank you counsel I have a question if the court were to determine that the hospital has standing but that there's no third party standing what would be the difference in the outcome of the relief like it's funny I never thought about it quite that way because I've assumed that there was standing both ways seemed pretty obvious to me that there was but that's just the way I was thinking about it I don't know that would be any difference in the outcome to tell you the truth judge McEwen we're advocating for a single thing we're advocating for a way to get on it's horse and do something and if it does the people that we're caring for in the interim will finally or their successors will finally have some place that they can be placed where they have a chance at rehabilitation and the ability to return to the civil society well let me jump in there because the complaint has certain counts as to the hospital and certain complaints as to the patients I take it that from a prior saying from a practical perspective there would be no difference I take it that in the complaint there will be certain counts that yeah yes I beg your pardon that's that's precisely what I'm saying because I've looked at the two sides of it and I've thought this these guys aren't just twins they're the same thing no that doesn't make any sense to me because the first party claims the hospitals making one of them is a due process claim right one of them is a federal takings claim yes and the other one is a state takings claim yes the remedy for a takings claim is pay me money pay me money the remedy for a takings claim is not provide suitable placement for those patients judge Fletcher pardon me I didn't mean to interrupt we have filed an amended complaint and the judge has never really indicated what he was going to do with it one way or the other but since his basis for dismissing the case and not allowing another complaint was he was saying that we volunteered for this problem I assume that I'm entitled at least bring this to your attention we've abandoned any suggestion we want any money that's not what we're here for we're we're searching for prospective relief of injunctive form that will permit our patients to get the treatment that they need so you're representing to me if you abandon any any request for a judicially ordered compensation monetary compensation that is my representation we ain't doing that and I think as we've thought about it we've decided it but that was that invited the kind of colloquy that it's just gone on here and we didn't intend to do that and just so we're clear because in my materials here I have the first amendment complaint I have the second minute complaint you're saying there was a proposed third amendment complaint no or just gonna drop what happened was the judge wouldn't let us file an amended complaint because he said we'd had the opportunity to file an amended complaint and we had we'd added a party and somehow the judge wasn't prepared to have us file a complaint that spilled out the things that judge Fletcher has been talking about in part and so we explained in detail why it is certain things are true and certain things are not and the judge frankly I'm not entirely clear as to how the judge handled that or what he did with it or whether he even thought about it there's just the right it just disappears into a hole okay so so if I'm looking at the Second Amendment complaint which does have takings claims in it you're saying that there's a there was a plan to file another complaint or that would not have taken claims or that you're just dropping it well if the second amended complaints you're looking at is the one that added the party there's no substantive change between that and the first but we filed a complaint which we labeled second amended complaint which spelled out in a good deal more detail what was going on and does not seek monetary relief I mean I the complaint I'm looking at which is second amended said with respect to the takings plaintiffs do not seek compensatory damages for OHA's unlawful takings is that correct yeah that's we're not in that game that's the one you have sought to file but it's not one that's not to second amended complaint okay well the thing I couldn't figure out was the numbers were throwing me you wouldn't think one and two would throw me but that did throw me just but in any event I knew that I knew that we'd made a declaration with respect to that so it's a taking it's a takings claim but the remedy for which is quit doing the taking rather than compensate me for paying us for it I have a few seconds left my friend mr. Buehler appears to argue that somehow we're stopped from bringing this action because we put up with this nonsense for all these years which is a sort of interesting concept when it comes to constitutional questions we have never signed on to a certificate which promises that we will do other than provide acute care in you drew the line exactly where the line is we said we would take care of people suffering from acute care and we're staffed and prepared to do that that's the certification we go through every couple of years just to keep track of what hospitals are supposed to be available to do certain things but it's got nothing to do nothing to do with promising that oh yeah and by the way once we've got these people stabilized we'll hold on to them for half a year because they're OH I won't put them somewhere I think what he's saying is every time you signed the certification you knew that you were going to be housing these people for longer so it's like kind of beating yourself up but keeping signing the certification I think that's what he's saying all right that that may be too if it was an exercise in self-flagellation we've quit this is a variation on the same question and maybe I'm not going to get a further elaboration why if it's well known to you that while you undertake contractually the obligation to provide the acute care as a practical de facto matter you're undertaking an obligation to keep these people for a very long time and you're losing money at it why are you doing this we that apparently some hospitals in Oregon don't sign up why is your why are your clients signing up for this if it's if it's a money loser we've been doing it because when patients present to us in need of emergency services and acute care we have to take them I'm taller requires us to take them and treat them we can't just say no we're not going to deal with you guys so what about the other what about the other hospitals in Oregon that are not signing up for this program why don't they have the same obligation that you do I think what happens with them is in taller requires them to provide at least emergency treatment and to try to find a hospital that's certified to provide the acute care and get them transferred to that but that has to do with acute care that has to do with just stabilizing them it is not a matter but those but the up but the reason you gave me so why your clients sign up for this program it would seem to me we will apply to every hospital in Oregon but there but that's not true you know judge Fletcher I don't know the answer to how many have not and I apologize for not knowing but I don't I'm assuming that there are some I'm representing the regularly sign on because that's the kind of staffing they do that's what their hospitals are set up for okay thank you very much counsel thank you if we're way over so you've got I beg your pardon yes yes you are and I appreciate the courtesy thanks very much very well I thank you both for outstanding advocacy today an excellent briefing we really appreciate it in a very interesting and challenging case this matter is submitted and we are done for the day
judges: McKEOWN, FLETCHER, OWENS